May it please the Court. My name is Richard Jacobson and I represent the appellant, Quinta Real. I would like to reserve three minutes for a rebuttal, if I may. Sure. Thank you. The District Court committed clear error by finding likelihood of confusion, despite the fact that the parties have coexisted for more than 25 years without any actual confusion arising, and despite Quinta Real actively marketing its hotel services to U.S. consumers who have come to the Mexican properties spending $10 million a year on room fees alone, and despite the unquestioned good faith by Quinta Real, both in selecting its name and in using its name. The District Court misapplied every one of the three factors, but before turning to likelihood of confusion, I would like to briefly touch on the Court's ruling on subject matter jurisdiction. Regardless of the academic debate over which use in commerce provision applies, the key issue here is that District Court's ruling was predicated solely upon two letters of intent, including one from 1994, both of which were completely disavowed and never went beyond the letter of intent phase, and yet the District Court found that these letters of intent and a statement to the media at the time the letter of intent was announced constituted concrete and meaningful preparation for the building of a hotel in the U.S. under the Quinta Real mark. The Lanham Act requires far more than intent or threat to infringe in order to be subject to its jurisdiction. The record reflects only Quinta Real's unformed and amorphous intent that someday, someday, it may want to build a hotel in the U.S. It has no plans in place. There is no investors. There is no country. They must have had some reason to go public with it. I mean, they didn't just keep it to themselves. That's correct, Your Honor. That was back in 2007. It signed a letter of intent with a developer in Tucson. The letter of intent was the subject of media coverage for about a day or so when it was announced. The developer explored plans, but by 2008, the project had completely fallen apart. Quinta Real invested no funds in the project and completely disavowed its intent to move forward with the project. La Quinta did not bring this lawsuit until the following year, 2009. And, in fact, when we filed our responsive pleading to their complaint, we stated in our answer and counterclaim that we had no intention of moving forward with the project. There was no claim there at the time. During the course of the litigation, we maintained that position. Then, when the district court judge in ruling on summary judgment made the determination that Quinta Real has not used its mark in commerce in the United States in the context of determining, that's why there's no actual confusion in the case, because it hasn't used its mark in commerce. At that point, it seemed that there was no confusion. Yes, Judge. Can I ask you a question? Yes. The question is, why should we consider the use in commerce language to be jurisdictional as contrasted with an element of the claims? An excellent question. Thank you, Your Honor. Under the infringement provisions for bringing trademark infringement and unfair competition, it specifically states that a plaintiff must have a protectable right and that the defendant must use in commerce a mark that is similar or a colorable imitation. Both the infringement statutes contain that as an element of the claim. And without that, the court doesn't have jurisdiction to bring the claim. But in addition to that, regardless of whether the court determines Quinta Real has made use in commerce of its mark, its speculative intent from a disavowed letter of intent from seven years ago is an insufficient basis upon which the court should have proceeded with the case. I wonder if you'd move on to the merits. Thank you, Your Honor. The district court misapplied the sleek craft factors and failed to consider the totality of the facts. As this Court restated just last this week in Falcon Stainless v. Rhinocos, the likelihood of confusion must be probable, not possible. And the likelihood of that confusion must affect an appreciable number of reasonably prudent consumers. And the district court failed to account for these principles. The most important element is the similarity of the marks. And the district court engaged in nothing more than a comparison of the two words that the parties used, La Quinta and Quinta Real, without evaluating the marks as consumers actually perceived them. And the parties have logos, they have images that's associated with the marketing, not to mention the distinct physical manifestations of their properties. Did the district court counsel discuss and use the term about umbrella brands, that someone may have this name and associate that name with, you know, some other, you know, parent group or other groups of hotels? Yes. The district court said that that is certainly possible, but that's an insufficient basis to find a likelihood of confusion. And second, it's inapplicable to the case because La Quinta is a single brand. They do not have other brands that operate under this so-called umbrella. And that's theory. But how would the regular consumer, someone who wants to go to La Quinta, to know that Quinta Real is not part of the La Quinta group? Well, under this umbrella theory, the plaintiff's witness testified that certain hotels, Marriott, for example, and Hilton, do operate various brands. Some use the master brand and some don't. So there's no rhyme or reason, but it's really inapplicable to this specific case because La Quinta is only advertising its name. And in addition, La Quinta markets itself very much around the Q. When its primary and sole witness testified and went through its trademark registrations, he emphasized the fact that the registrations also have the letter Q, which is bolded. Its website that it advertises and publicizes and spends millions promoting, they use as their mastered website domain LQ.com. The record also shows no evidence whatsoever that La Quinta has any secondary meaning or any recognition whatsoever for Quinta alone. But the argument seems to suggest that an infringement action based solely upon the words is insufficient. When there are other aspects of how consumers perceive the marks in the marketplace, yes, this circuit's case law, and it's consistent throughout the country, the court must look at it from the perspective of the reasonably prudent consumer evaluating and being exposed to the marks in the marketplace. And La Quinta never uses Quinta alone, and as I stated, it often uses LQ, just as its toll-free number is Sleep LQ. So the Quinta Real also uses its QR registered trademark as part of its logo, and that logo also includes grand class hotels and resorts. That appears on its website. It appears on its marketing materials. It appears on the DVD that's included in the excerpts of record, and that is prominent in all of those materials. Counsel, if I could interject a question here. Sometime in your argument, either now or in rebuttal, I would appreciate if you would address what is the significance of the fact that this decision on appeal was a bench trial judgment following trial rather than a summary judgment. So, for example, if the court had given a summary judgment to La Quinta, then we'd have to look at all the facts and give all the inferences to Quinta Real. But since there was a bench trial, how does that play out with the sleep-craft factors? Do we have to look at what the district court said on some of those and ask if they're clear error? I think that the standard remains clear error. And as a terrific example of that, we look at the actual confusion portion of the district court's decision. The district court said that there was no actual confusion. I'm sorry. The district court said that actual confusion was neutral, and yet it was undisputed that over 25 years there was no actual confusion. And look at that with the coexistence, the fact that 40 percent of our clientele come from the U.S., hundreds of thousands of consumers, and then when you factor in La Quinta's marketing, spends $40 million a year, rents 23 million rooms a year, the opportunities for actual confusion were tremendous. So the lack of actual confusion is overwhelming evidence of no likelihood of confusion. And we don't suggest that that is an issue of altering the landscape in terms of what the district court judged, but it's clear error for him to have factored that in as neutral rather than in favor of Quinta Real. Likewise with the intent factor. The district court not only committed clear error, it committed legal error by looking and determining, yes, Quinta Real acted in good faith, but I'm going to introduce another factor into the process, lack of prejudice, no citation to any case law to support this, and then ruled intent against Quinta Real. So I don't believe that this panel's position is in any way inappropriate to look at this situation and find clear error based upon his going through the various factors. Likewise, the degree of care, the decisions that the district court judge made, Judge Gould, are amenable to review and appeal. So, for example, under the degree of care, the district court imposed hypothetical and speculative possibilities that consumers may make erroneous purchasing decisions, despite the fact showing specifically to the contrary in the case law in our briefs, showing that consumers of hotel services and meeting planners are sophisticated. The Parker, the Dunphy Hotels case cited in our papers is instructive on this point. Parker House, a famous hotel in Boston, sued New York's Parker Meridian Hotel, and the court said, yes, Parker House, you have secondary meaning, but not for Parker alone and we're not going to enjoin Parker Meridian, partly because of the different level and aspect of service that you provide, which Quinta Real also provides a very high level of service, and because of the French ambiance that is part of what they provide to consumers. I see I'm nearing. Would you like to reserve? You wanted to reserve three minutes. Thank you. Thank you, Mr. Jacobson. Good morning. Good morning, and may it please the Court. My name is Joseph Giaconda of the Giaconda Law Group. I represent the appellee, the plaintiff in the district court action, La Quinta Worldwide. With respect to the subject matter jurisdiction point, based on the indisputable facts that are in the record that the court found after the bench trial, it demonstrated that there is a clear controversy between the parties today, just as there was in 2008 and 2009 when this lawsuit was going on. The evidence at trial that the district court heard demonstrated that Quinta Real had filed a sworn intent-to-use application in the United States Patent and Trademark Office, which swore that it had a bona fide intent-to-use, the name Quinta Real, in the United States, which La Quinta and Quinta Real were litigating at the time. While that case was proceeding through discovery in the Trademark Office, La Quinta discovers by reading the newspaper that Quinta Real had signed a formal letter of intent in Tucson with a real estate developer who was using that document in the media and to seek financing to build a Quinta Real hotel at a specific location less than one mile from an existing La Quinta property. The developer was entering into contracts with the municipality as well. So La Quinta, having already been in litigation with Quinta Real for years and putting them on notice that we would consider anything that they would do in the United States under the name Quinta Real an infringement, sued in Tucson seeking an injunction. Quinta Real now argues that La Quinta sued too soon, yet in the same brief argues that we sued too late because we should have brought suit in 1994, back when they first considered San Antonio as a possibility. The relevant test here, as Judge Gould alluded to in his question, is twofold. The first is, in Article III, case of controversy must exist. That is, the parties must be joined in a dispute that is of sufficient immediacy and reality so that the decision the district court is rendering is not merely advisory. The law holds further that under the Lanham Act that a party who has merely a vague and unformed desire to infringe does not trigger liability under the Lanham Act. And that's obvious. We don't dispute any of that. However, as an infringer progresses and begins to take concrete and meaningful steps and engage in actual conduct, he crosses a line and may fairly be sued in a district court in order to determine the rights relative, the parties' rights relative to one another. Here, Quinta Real more than crossed the line when, after first exploring the marketplace in 1994 and being in litigation with Quinta Real for seven years, decided that it was going to enter into a detailed letter of intent, the real estate developers using the mark on the letterhead and going around and making press announcements, and importantly, Quinta Real testified at trial that it still has entry into the U.S. hotel marketplace as the, quote, next step in its business plan. Quinta Real further considered San Diego, Los Angeles, Houston, San Antonio, Miami and New York and, quote, all the major cities for its expansion plans. And finally, Quinta Real's attorneys swore in the intent to use application that it has the bona fide intent to use the mark. And at trial, we asked that question of the witness, and Quinta Real's witness testified, absolutely, that's still their intention today, and that's precisely why we're here today. Finally. Let me ask you this. I'm more interested in the merits of this, to be honest with you. Do I understand correctly that La Quinta operates motels in Mexico? There are several La Quinta hotels in Mexico that currently exist. There are a few in the pipeline as well. Using the La Quinta name. That's correct, Your Honor. In Mexico where Quinta Real operates. That's correct, Your Honor. I'm trying to get my mind around how it is La Quinta can keep Quinta Real from coming to the United States and using Quinta, but they can go to Mexico and use La Quinta. Well, the district court heard extensive evidence on this issue, Your Honor. La Quinta Real pointed it out repeatedly throughout trial. And Mr. Trivedi, the Vice President of La Quinta, testified at great length at the bench trial that the parties have been in dispute in Mexico for years in the Mexican Trademark Office over their respective rights in Mexico with respect to their term Quinta Real and La Quinta. And the reason why it is a very different analysis is because the marketplace there is very different. And there was testimony at length at trial that the word Quinta in Spanish because it means the country house in Mexico is widely used as a generic or descriptive term such as villa might be used in Italy. And so consequently, similar to the La Posada case that was decided by the Trademark Office of the TTAB in the 1970s where it found that La Posada could have a very different meaning in Mexico where Posada means something descriptive or generic there. The same word in the United States, because the majority of citizens and consumers are not Spanish speakers, may assume that, may come to believe Posada to be a brand. And that's the case here where the marketplace, the language is different, the legal regime is different, the respective rights are different. And so one might not expect confusion in Mexico where everyone believes Quinta as a weaker mark or maybe not a mark at all. But in the United States where people know Quinta, La Quinta from all of La Quinta's advertising, they know it as a brand. So there can be very different expectations based on the relevant languages, the relevant marketplaces and the relevant legal systems. And that's not to say that the parties haven't had their share of skirmishes in the Mexican authority, in the legal system in Mexico to try to understand where their respective spheres begin and end there. Did Judge Collins deal with that aspect of it in his order? He did, Your Honor. Say about that. What he did is he essentially did decline to exercise any jurisdiction over enjoining the parties' activities in Mexico because it was beyond the purview of this case. He made no adverse credibility. No, no. I understand he can't, you know, tell them what they can do in Mexico. But did he weigh that in terms of deciding equitable relief? I didn't see that in his order. Well, in the trial record, there is a very lengthy colloquy back and forth between the district court, the witness, and during cross-examination about La Quinta's respective positions in Mexico, its properties in Mexico, how it's using the market in Mexico, its expectations there. So the court may not have explicitly referenced it in its order, but the record is replete with evidence, both documentary evidence and testimony, in which the district court had a full understanding and had the opportunity, therefore, to consider the equities and the respective positions of the parties in Mexico in fashioning the relief in the United States. Counsel, if I could ask you a question. Yes, sir. I will say I also share a little of concern, if Judge Silverman is concerned, about whether the principle like what's sauce for the goose is sauce for the gander applies in a trademark suit. So it is a little troubling to understand that La Quinta's opening up hotels in Mexico, but Quinta Real can't do the same here. But let me get back to the question that I really want to hear an answer on. What is the significance for our assessment of the merits issues under Sleekcraft of the fact we had a bench trial? Yes, Your Honor. What's our standard of review on each of those Sleekcraft factors? Yes, Your Honor. It is clear under the case law that the court should grant deference to the court to district court's entire Sleekcraft analysis and only disturb findings of fact or conclusions of law if they are clearly erroneous. The district court relied on no presumptions, no inferences, and had an opportunity to hear both sides fully and fairly present their factual evidence at trial. There was cross-examination. Hundreds of documents were admitted. Videos were played in open court. The parties submitted briefing both before and after trial. There was oral argument, opening and closing arguments. The district court in no way gave any party the benefit of the doubt on any issue. The entire trial was a matter of the court conducting the Sleekcraft analysis, looking at the credibility of live witnesses, and evaluating cross-examined witnesses and their respective testimony. And therefore, after trial, when the court conducts its eight-factor Sleekcraft analysis, this court should only disturb the lower court's findings if they are clearly erroneous, either on the facts or the law. And here, the district court went through each of the eight factors in detail and correctly found that seven out of the eight factors were clearly in LaQuinta's favor, and the eighth factor, that is, actual confusion, is neutral because none would be expected, given the factual circumstances. What Quinta Real would like to do is effectively retry the case, and my opponent mentioned during his argument that the district court got every single one of the eight Sleekcraft factors wrong. Well, that's the – first of all, that's hard to believe, and second, that's literally the standard that they would have to prove in order to believe that the district court got this entirely wrong, because the Sleekcraft analysis, as this Court has found, is a pliable test. It's not a series of hoops that – or checkboxes that the district court must go through and that we tally up and at the end of the case add up which side wins. The court heard all of the evidence and found, after trial, that LaQuinta had indisputably managed a brand in the United States, a strong commercial brand with over 800 hotels both owned and franchised in virtually every state of the union, and that Quinta Real testified at trial that it would suffer no prejudice or injury whatsoever if forced to choose a different brand. That's a very important statement about prejudice. They testified that it was their preference to use this brand, but it is not necessary for them to do so. They could use Q.R. or some other name, and that is why the court found, after going through all of the factors, that LaQuinta would be irreparably injured by harm to its brand if Quinta Real were to open a property in the United States, causing consumer confusion here. Further, when you go through each one of the Sleekcraft factors, seriatim, it's clear that the district court engaged in a thoughtful analysis and relied upon evidence that, while Quinta Real would like today to dispute, at trial it did not dispute. So Your Honor mentioned the umbrella brands theory. This was, first of all, not so much a theory as much as an observation by LaQuinta's trial witness, who testified about something that is just obviously true, which is in the hotel industry, brands offer service offerings at multiple layers. So you may stay at a Hilton property that has one type of offering in a service price range, and or a Marriott courtyard, courtyard suites, et cetera, et cetera. And what the district court found, which was credible, unchallenged, and during cross-examination, it wasn't like this was a contested point. They never asked a single question of LaQuinta about this at trial, and their own witnesses didn't dispute it. So the district court said, it seems like a reasonable proposition to me that customers will see a Quinta Real, even if it is a five-star resort hotel, and reasonably conclude that it is probably a LaQuinta service offering and make an association and be confused, and LaQuinta would both be – LaQuinta Real would both benefit from and LaQuinta would be harmed by that because it would create a service offering under the trademark LaQuinta, causing confusion that would harm the brand. And it's important to note, Your Honors, that the trademark that LaQuinta owns is not – is not limited to a select service hotel or a motel chain. It is for hotel and motel services in the United States for the words LaQuinta. And as to Judge Silverman's question about how the mark is used in actual commerce in the marketplace, the district court went through the record after trial and found that the way that LaQuinta and Quinta Real, the marks are respectively used in the marketplace, is as shorthand as LaQuinta and Quinta Real. For example, the website Quinta Real uses is QuintaReal.com. There was evidence at trial that they used the name Quinta Real, just the words, to describe their properties on their website, on their brochures, and in their marketing. So it was certainly not clear error for the district court to hear all of that testimony and say, customers are going to use the shorthand LaQuinta and Quinta Real and assume that there's a connection when there isn't. Counsel, let me ask this of you concerning the factors that the district court went through. This finding that Quinta Real's intent in selecting the mark was not done in bad faith. And the conclusion that the court gave in weighing that fact in favor of LaQuinta, is that an incorrect conclusion? Wasn't that merely towards the issue of remedy? No, Your Honor. One of the Sleecraft factors that's proposed, not in the statute but by this Court in Sleecraft, one of the factors proposed as a guidepost for the district courts to consider in fashioning its overall determination of likelihood of confusion is the junior user's intent. And in this case, the court found that while there was no intent to cause confusion when they adopted the mark back in the 1980s, what it was disturbed by was the testimony by the defendant that it was aware of the LaQuinta marks, it was in litigation with LaQuinta in 2007, and basically committed willful blindness to say, we just don't think that there's going to be confusion. So despite the objections, despite all the facts, we're going to go ahead and sign this letter of intent and basically not disclose it to LaQuinta and go move forward with this property. What the district court found is that factor, among all the other factors, tilted in favor of LaQuinta. But that was just one factor. It was not – it didn't cite to any case law because it is – it's one of those factors that didn't fit neatly into a precedent where it was clear that the infringer was either a pure good-faith infringer or a bad-faith infringer. This was an infringer who, on this particularly unique set of facts, was clearly aware of LaQuinta's strong trademark rights for decades, was in litigation with LaQuinta, entered into this letter of intent, and decided to run roughshod over LaQuinta's rights. And the court rightly found that, considering those facts, to be a factor that wouldn't favor Quinta Real and, in fact, favor LaQuinta. Roberts. Thank you, Mr. Giugonda. Mr. Jacobson, back to you. You've got about three minutes and change left. By the way, the noise you're hearing was a pipe. A pipe broke the other day. They were fixing it, so I apologize for the extraneous noise here. Okay. Thank you. The interpretation that we just heard about, the good faith, is not contained in the Court's decision. In fact, the Court's decision said Quinta Real chose to enter the American market based on the goodwill the mark had acquired in Mexico, not because it wished to capitalize on any goodwill associated with LaQuinta's mark. And there's no reference to any factor in terms of its entry into the market, nor any reference to the prior litigation between the parties. That's simply not the reference. So while that may be less probative on the likelihood of confusion, it would still cast some weight in crafting a remedy, wouldn't it? Absolutely. And the District Court's decision provides foreshadowing of that, yet never addressed the good faith and the remedy aspect. And the remedy aspect is based upon nothing but a presumption which the Supreme Court and this Court no longer apply, because the District Court opinion says likelihood of confusion is equivalent to irreparable injury. And that's simply not the law in this circuit. And the precedent cited by the District Court does not support that determination. If I may, I'd like to step back to Mexico and the irreconcilable inconsistency that I think the panel has highlighted. Because that's also present in the litigation that LaQuinta had been involved in for several years with the LaQuinta resort that is a grand old story resort. It had been around for decades prior to LaQuinta. And in that litigation, if we're going to talk about inconsistent positions, LaQuinta, the plaintiff, took the position that there was no likelihood of confusion when its use was challenged, despite the fact that there the marks were identical. And now it has taken the other's position here. And with respect to the understanding of the term LaQuinta, the testimony at trial by our witnesses who are Mexican nationals and have spent and lived in the United States as well, was that there are 50 million Spanish speakers in the United States. And that one of the intentions of Quinta Real, including an excerpt read by counsel from the deposition, was that Quinta Real was interested in the southern states of the United States, where there's a strong Spanish and Latino population. Because they understand Quinta, and they understand it's not associated with any specific business. The reference to the La Posada case is not on point, because there the issue in that case was whether the mark could be entitled to a supplemental registration, which gives it very little weight. And because of the fact that LaQuinta simply means country house, it's constrained by virtue of those inherent limitations in the descriptive aspect of the mark, notwithstanding its registrations in place. Turning then just to the intent to use issue, Quinta Real filed its intent to use applications in 2001. Quinta Real respects the rule of law, and while its intention someday is to do that, it's been tied up in litigation with LaQuinta. And we certainly hope and have the strong objective that someday we may be able to bring our brand to the United States, because we do not feel that there is any confusion between the parties. The record before the court shows no actual confusion, no intent to deceive or capitalize on any goodwill other than the goodwill of Quinta Real. And for that reason, we request reversal. Thank you. I know your time is up, but I have one question I'd like to have you answer. Yes, Judge Gould. Given the injunction, did the district court expressly address the significance of LaQuinta's entry into the Mexican market? No, no, your honor. The district court judge did not address that point, and we pointed out the irreconcilable inconsistency between its positions. LaQuinta merely said Mexico's a different language and different culture. And as I just stated to the court, the Mexican and Spanish culture is very strong here in the United States. And consumers are able to differentiate between names where Quinta alone is not associated with any particular entity, just as they associate between a holiday in, days in, comfort in, all those entities that use in. Thank you. Thank you, gentlemen. Thank you. The case just argued is submitted. Good morning.
judges: Lemelle, Silverman, Gould